IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| SCALA'S ORIGINAL BEEF<br>& SAUSAGE COMPANY, LLC, | )<br>)<br>) | |
| Plaintiff, | )<br>) | Case No. 09-cv-7353 |
| v. | )<br>) | Judge Robert M. Dow, Jr. |
| MICHAELANGELO ALVAREZ d/b/a<br>MICHAELANGELO FOODS, | )<br>)<br>)<br>) | Magistrate Judge Maria Valdez |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Scala's Original Beef & Sausage Company LLC ("Scala's") has filed suit against Defendants Michaelangelo Alvarez d/b/a Michaelangelo Foods and Michaelangelo Foods, LLC (collectively, "Defendants") alleging: (1) trademark infringement in violation of the Lanham Act, 15 U.S.C. § 1114(a); (2) unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125(a); (3) violation of the Illinois Deceptive Trade Practices Act, 815 ILCS § 510/1 *et seq.*; and (4) violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS § 505/1 *et seq.* The complaint also seeks a declaratory judgment that Scala's is entitled to sell and distribute giardiniera under the "Scala's" and "Scala's Preferred" marks.

Currently before the Court is Scala's motion [6] for a temporary restraining order ("TRO") enjoining Defendants from the marketing or sale of giardiniera or other food products bearing the trademark of "Scala's Preferred" or "Scala's." Specifically, Plaintiff seeks an immediate order temporarily restraining Defendants from (1) infringing Plaintiff's two federally registered trademarks and (2) displaying content on Defendants' product labels and

1

website that conveys an affiliation between Defendants' and Plaintiff's products. Although the motion presents a close call, the Court concludes that under the sliding scale standard that applies in this circuit, Scala's has not carried its burden of demonstrating a right to the extraordinary remedy of a TRO. Accordingly, Scala's motion [6] is respectfully denied.

**I.     Background**

Scala's is a distributor of Italian meats and related food products. Scala's and its predecessors have been selling food products under the Scala's name since approximately 1925. In 1949, Pasquale Scala – Scala's founder – incorporated the business under the name, Scala Packing Co., Inc. ("SPCI"). In approximately 1960, SPCI began selling bottled giardiniera under the "Scala's" and "Scala's Preferred" brands. In August 2007, SPCI filed two applications with the United States Patent and Trademark Office seeking to register "Scala's Preferred" as a trademark for enumerated Italian style food products. On September 23, 2008, SPCI received the two trademarks for which they applied.

Defendant Alvarez began working for SPCI in 1996. On August 25, 2008, Alvarez, on behalf of his company Michaelangelo Foods, entered into an agreement with SPCI. In its entirety, the agreement consists of three paragraphs:

> This Agreement, effective August 25, 2008, is between Scala Packing Co., Inc. ("SPCI") and Michaelangelo Alvarez D/B/A Michaelangelo Foods ("MAF"). SPCI hereby sells the entire prepared vegetable division to MAF for $1,000.00.
>
> SPCI is presently unable to finance the operation of this division. MAF has previously advanced $6,150.00 to SPCI, as a loan to enable the business to continue until this sale.
>
> SPCI also hereby agrees to grant a license to MAF to exclusively use the "Scala" name, logo and any other intellectual property subject to any copyright for prepared vegetables and agrees not to compete with MAF and waives any interest in any and all prepared vegetables and the recipes that are used to make them. This agreement shall be binding on any successor or assigns of SPCI.

The agreement is silent as to its duration and it contains no termination clause.

Prior to August 2008, SPCI's giardiniera and other prepared vegetables were produced by E. Formella and Sons. According to Alvarez, at the time that he purchased SPCI's prepared vegetable division, E. Formella and Sons had refused to continue supplying SPCI because of past non-payment. SPCI's customers for giardiniera and prepared vegetables included Jewel, Super Fresh, and Piggly-Wiggly. However, Alvarez states in his declaration that, at the time that he purchased SPCI's prepared vegetable division, it had no pending orders and no inventory. In addition, Jewel had stopped placing orders with SPCI because of delivery problems.

Since Alvarez obtained the license, he has sold giardiniera and prepared vegetables to Jewel, Super Fresh, and Piggly-Wiggly under the Scala's label. During that time, Alvarez has invested nearly $50,000 in the business, which has annual gross revenue of $200,000.

On August 12, 2009, SPCI notified Defendants in writing that the license to use the "Scala's" name and logo on vegetable products was terminated, effective immediately. Despite the purported termination of the license agreement, Defendants continue to sell vegetable products, including giardiniera, under the "Scala's" name. Scala's alleges that the labels that Defendants use on their giardiniera and other products infringe Scala's trademarks. Defendants contend that Scala's has breached the agreement and maintain that the license remains valid and/or the trademark has been abandoned as to prepared vegetables.

In a letter dated October 27, 2009, Scala's demanded that Defendants cease distributing products bearing the "Scala's" name. Defendants refused to do so by letter dated November 9, 2009.

On November 5, 2009, SPCI and Scala's entered into an Asset Purchase Agreement under which Scala's was to acquire, among other assets, "all trademarks, trade names, logos, service marks, brand marks, brand names, [and] domain names" of SPCI's, as well as all goodwill relating to those assets. The closing of the Asset Purchase Agreement took place on November 23, 2009. That same day, Scala's initiated this lawsuit and filed its motion for a temporary restraining order. The motion was presented on December 2, 2009, at which time counsel for Plaintiff conducted a brief in-court direct examination of Defendant Alvarez and the Court set a schedule for additional briefing on the TRO motion. That motion is now fully and capably briefed and ready for decision.[1]

## II.     Analysis

Like all forms of injunctive relief, a temporary restraining order is "an extraordinary remedy that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original). A party seeking a temporary restraining order must demonstrate as a threshold matter that (1) its case has some likelihood of succeeding on the merits; (2) no adequate remedy at law exists; and (3) it will suffer irreparable harm if preliminary relief is denied. *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir. 1992). If the moving party meets this burden, then the court must consider the irreparable harm that the nonmoving party will suffer if preliminary relief is granted, balancing such harm against the irreparable harm the moving party will suffer if relief is denied. *Storck USA, L.P. v. Farley Candy Co.*, 14 F.3d 311, 314 (7th Cir. 1994). Finally, the court considers the public interest served by granting or denying the relief, including the effects of the relief on non-parties. *Id.*; see also *Credit Suisse First Boston, LLC v. Vender*,

---

[1] The parties also briefed Defendants' motion to disqualify counsel for Scala's, which the Court denied in a memorandum opinion and order [23] entered on December 10.

4

2004 WL 2806191, at *1 (N.D. Ill. Dec. 3, 2004). The court then weighs all of these factors, "sitting as would a chancellor in equity" (*Abbott*, 971 F.2d at 12) and applying a "sliding scale" approach, under which "the more likely plaintiff will succeed on the merits, the less the balance of irreparable harms need favor plaintiff's position." *Ty, Inc. v. The Jones Group*, 237 F.3d 891, 895 (7th Cir. 2001).

> A.   **Likelihood of Success on the Merits**

A party seeking a TRO or a preliminary injunction must demonstrate "that it has a 'better than negligible' chance of success on the merits of at least one of its claims." *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S.A.*, 549 F.3d 1079, 1096 (7th Cir. 2008). This is an "admittedly low requirement." *Id.* Scala's argues that it is likely to succeed on the merits of its Lanham Act claims because: (1) Scala's has a protectable mark; (2) the license agreement was legally terminated, such that Defendants' continued use of the mark is without Scala's consent; and (3) Defendants' unauthorized use of the mark creates a likelihood of consumer confusion. Defendants respond that: (1) Scala's has abandoned its trademark as to prepared vegetables; (2) the license agreement was not validly terminated; and (3) Defendants' use of the name "Scala's" is not likely to cause confusion in the marketplace because Scala's currently is not selling prepared vegetables.

In assessing the likelihood of confusion, the Seventh Circuit has held that district courts should consider seven factors: (1) similarity between the marks in appearance and suggestion; (2) similarity of the products; (3) the area and manner of concurrent use; (4) the degree of care likely to be exercised by consumers; (5) the strength of the plaintiff's mark; (6) whether actual confusion exists; and (7) whether the defendant intended to "palm off" his product as that of the plaintiff. *CAE, Inc. v. Clean Air Engineering, Inc.*, 267 F.3d 660, 677-78 (7th Cir. 2001).

5

Scala's argues – and Defendants do not vigorously contest – that these factors weigh in favor of a finding of a likelihood of confusion. Based on its review of the two labels, the Court agrees that Scala's has made a fairly strong showing that Defendants' labels are likely to cause confusion.

Defendants' argument that there can be no confusion because Scala's currently is not selling prepared vegetables is not persuasive. If the license was validly terminated and Scala's has a protectable mark, then there is a substantial risk that consumers purchasing products distributed by Defendants would believe that they were in fact purchasing products distributed or licensed by Scala's. That confusion as to the source of the products is not dispelled by the fact that Scala's is not currently selling a competing line of prepared vegetables (although it is selling other food products using the Scala's marks). See *Geneva Intern. Corp. v. Petrof, Spol, S.R.O.*, 608 F. Supp. 2d 993, 1003-04 (N.D. Ill. 2009) ("A trademark serves as an indicator of origin, assuring customers that the goods and services sold under the trademark are of a uniform nature and quality").

Of course, the likelihood of confusion is meaningless if Defendants retain a valid license. The validity of the termination of the license turns on whether Scala's is correct that the license agreement was terminable at will. Having carefully considered the arguments advanced in the parties' briefs, the Court finds that Scala's has demonstrated that it has at least some likelihood of demonstrating that the termination was valid.

Under Illinois law, "contracts of indefinite duration are generally deemed terminable at will by either party." See *A.T.N., Inc. v. McAirlaid's Vliesstoffe GmbH & Co. KG*, 557 F.3d 483, 486-87 (7th Cir. 2009) (citing *Jespersen v. Minn. Mining & Mfg. Co.,* 700 N.E.2d 1014, 1016 (Ill.1998)). There is an exception to this rule for agreements that, although they lack a

fixed duration, are terminable only upon the occurrence of specific, enumerated events. See *Jespersen,* 700 N.E.2d at 1016. Such agreements are not terminable at will. *Id.* By contrast, an agreement of indefinite in duration that sets forth a non-exclusive list of reasons for termination can be terminated at will. *Id.* at 1017.

Here, the license agreement is of indefinite duration and the agreement contains no termination provision. Scala's contends that under *Jespersen* and its progeny the license thus is terminable at will. Defendants counter by urging the Court to find the license to be perpetual based on the economic realities of the transaction. In *Baldwin Piano, Inc. v. Deutsche Wurlitzer GmbH*, 392 F.3d 881 (7th Cir. 2004), the Seventh Circuit concluded that the economics of the transaction favored treating the trademark license at issue – which had no stated duration – as perpetual, rather than terminable at will. However, *Baldwin Piano* is not directly on point, for unlike the agreement here, the agreement in *Baldwin Piano* contained an exclusive list of reasons for termination, and that language appears to have influenced the court's decision. See *Automation By Design, Inc. v. Raybestos Products Co*., 463 F.3d 749, 760 (7th Cir. 2006) ("The *Baldwin Piano* court relied on an Illinois Supreme Court decision holding that a non-exclusive list of reasons for termination makes the term of the contract indefinite and permits termination at will"). An important legal question at the preliminary injunction (and perhaps summary judgment) stage of the case will be the extent to which the sparse terms of the agreement into which the parties entered must be informed by the economic realities and other contemporaneous circumstances at the time that the agreement was signed. And that question, in turn, will be informed by the more precise understanding of those realities and circumstances that will be available after further factual development of the case. For present purposes, however, even if *Baldwin Piano* may cast some doubt on the likelihood

7

that Scala's can establish that the license was terminable at will, Scala's still easily clears the "better than negligible" threshold.

Finally, Defendants argue that Scala's has failed to demonstrate the requisite likelihood of success on the merits of its trademark infringement claim because Scala's has abandoned its mark in connection with prepared vegetables. Defendants advance two abandonment arguments. First, Defendants contend that Scala's abandoned the mark through so-called "naked" licensing, by failing to retain control over the quality of the goods that Defendants sold under the mark. See *TMT North America, Inc. v. Magic Touch GmbH*, 124 F.3d 876, 885 (7th Cir. 1997) ("[a] trademark owner * * * can abandon all trademark rights through uncontrolled or 'naked' licensing"). Second, Defendants argue that Scala's abandoned the mark through non-use. See *Miyano Machinery USA, Inc. v. MiyanoHitec Machinery, Inc.*, 576 F. Supp. 2d 868 (N.D. Ill. 2008) ("A mark may be deemed 'abandoned' when its use has been discontinued with no intent to resume such use"); 15 U.S.C. § 1127.

Scala's responds that, under the doctrine of licensee estoppel, Defendants are estopped to deny the validity of Scala's trademark rights by claiming lack of quality control or non-use during the term of the license. The doctrine of licensee estoppel bars "a former licensee * * * from challenging its former licensor's trademark based upon facts which arose during the course of the license." *Chrysler Motors Corp. v. Alloy Automotive Co., Inc.*, 661 F. Supp. 191, 193 (N.D. Ill. 1987); see also *Bunn-O-Matic Corp. v. Bunn Coffee Service, Inc.*, 88 F. Supp. 2d 914, 927 (C.D. Ill. 2000) ("licensees are estopped from raising any events prior to the termination of the license to challenge the validity of the licensor's trademarks"). Again, Scala's has shown a sufficient likelihood of success on its licensee estoppel argument to clear the admittedly low bar at the TRO stage. At the same time, however, the Court notes that

8

"licensee estoppel is an equitable doctrine, and a court remains free to consider the particular circumstances of the case, including the nature of the licensee's claim and the terms of the license." RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 33, cmt. d (1995). At this early stage, it appears that Defendants may be able to avoid licensee estoppel on equitable grounds given the circumstances surrounding the origin of the license.

On balance, while there are underdeveloped issues of both contract and trademark law that may affect the ultimate disposition of the case on the merits such that it would be premature to opine on a likely victor, Scala's burden at this stage simply is to show a "better than negligible" likelihood of success. It easily has done that. At the same time, because Scala's case on the merits does not appear to be overwhelming at this time, it will be required to make a clear showing that some or all of the other factors also favor its position to be entitled to temporary injunctive relief under the sliding scale approach.

### B. Irreparable Harm/Absence of Adequate Remedy at Law

"[I]t is well-established in the Seventh Circuit that irreparable harm and inadequate remedy at law are presumed in trademark and trade dress infringement cases." *Dunkin' Donuts Franchised Restaurants LLC v. Elkhatib*, 2009 WL 2192753, at *4 (N.D. Ill. July 17, 2009); see also *Re/Max N. Cent., Inc. v. Cook,* 272 F.3d 424, 432 (7th Cir. 2001). Defendants do not contest the proposition that unauthorized use of another's trademark establishes irreparable harm, but contend that Scala's has not shown the harm to be immediate because Scala's is not currently selling prepared vegetable products. However, while the fact that Scala's currently is not selling a competing product may affect the extent of the harm, it does eliminate that harm altogether. The Seventh Circuit has recognized that "[t]he most corrosive and irreparable harm attributable to trademark infringement is the inability of the victim to control the nature and

quality of the defendants' goods." *Re/Max*, 272 F.3d at 432 (quoting *International Kennel Club of Chicago, Inc. v. Mighty Star, Inc.,* 846 F.2d 1079, 1092 (7th Cir. 1988)). Consequently, "[e]ven if the infringer's products are of high quality, the plaintiff can properly insist that its reputation should not be imperiled by the acts of another." *Id.*

Here, the potential irreparable harm to Scala's arises from its inability to control the goods distributed by Defendants, which is true whether or not Scala's currently is competing with Defendants in the market for prepared vegetable products. Moreover, while Scala's is not using its mark in that arena, it still does use the mark in selling many other products, including meat products. Because Defendants continue to distribute goods bearing the name "Scala's," the potential for harm as a result of improper use of the mark is immediate. See *Re/Max*, 272 F.3d at 432 ("While Cook continues to use Re/Max's marks and logos, it has no quality over the services she provides or potential harm to its goodwill").

Nevertheless, while Scala's has met its burden of showing the absence of an adequate remedy at law and irreparable harm in the absence of injunctive relief, that factor does not weigh as heavily in the TRO analysis here as it does in many other Lanham Act cases because of the peculiar circumstances in which the relationship between the parties arose. In particular, on the limited record now before the Court, it appears that (1) at the time of the license, Scala's was unable to consistently pay its suppliers or deliver product to its customers on a timely basis and (2) Defendants have taken substantial steps toward mending those strained relationships. In fact, it appears from the face of the parties' agreement that a loan from Defendants was necessary to allow the prepared vegetable business to survive until the sale/license agreement was signed. Thus, while Scala's legitimately invokes its right to control the quality of products sold under its marks, the need for immediate injunctive relief to vindicate that right

(and correspondingly to alleviate the harm) is reduced where, as here, the efforts of the alleged infringer in all likelihood have enhanced the value of the mark.

### C. Balance of Harms and Public Interest

Because Scala's has made a sufficient showing as to the first three requirements for the issuance of a TRO, the Court must consider the extent of harm that Defendants would suffer if preliminary relief is granted, and balance that harm against the harm that Scala's would suffer if relief is denied. The Court also must consider the effect of a TRO on the public, and weigh all of the factors under this circuit's sliding scale approach.

Defendants argue that if the TRO is granted they will suffer irreparable harm because an injunction "will likely ruin [their] business, and will * * * impose a devastating financial hardship on" Defendant Alvarez, as the prepared vegetable business is his only source of income. According to Defendants, the financial harm that they will suffer outweighs any potential harm to Scala's, which will suffer no loss in sales because it is not currently selling prepared vegetables. Scala's contends that the balance of hardships favors the issuance of a TRO because the irreparable harm to its goodwill and reputation outweighs any harm to Defendants, given that Defendants may continue to distribute their products under their own name.

Defendants may overstate the harm that a temporary injunction would impose, in light of the fact that a TRO would not prohibit Defendants from selling their current inventory, maintaining relationships with existing clients, or developing relationships with new clients. It would require them only to remove the Scala's labels and logos from their products and website. However, given that Alvarez has invested a significant portion of his savings in the business, which is his only source of income, and that his in-court testimony evidences

relatively low profit – both gross and net – from the enterprise, an injunction no doubt would do substantial damage to Defendants' finances. Moreover, it is by no means certain that the opportunity to collect on a bond at the end of the case in the event that the injunction was erroneously entered would be sufficient to sustain Alvarez and his company through any protracted litigation.

On the other side, harm to Scala's goodwill and trademark are presumed. However, as noted above, the extent of the harm to Scala's is reduced substantially by the peculiar facts of this case. While it is true that Defendants did not build their giardiniera business from scratch, the facts currently before the Court show that at the time that Defendants obtained the license in August 2008, SPCI's prepared vegetable business was performing badly; it had lost both its supplier and one of its largest customers as a result of financial problems. Indeed, while the contract at issue puzzlingly did not address seemingly important matters such as termination, it did specifically reference the then-current state of SPCI's business and the difficult circumstances in which Defendants took the license and embarked on reinvigorating what once was SPCI's vegetable division. It thus seems clear that, at the time that Alvarez began selling prepared vegetables under the Scala's name, the value of the Scala's trademark – at least with respect to prepared vegetables – was on the decline. Over the past sixteen months, Alvarez has labored to rebuild the prepared vegetable business and appears to have boosted the value of the Scala's trademark in connection with prepared vegetables. Taking all of these circumstances into account in the weighing of the harms asserted by both parties, the Court concludes that the balance tips in favor of Defendants.

Finally, Scala's argues that the public interest favors the issuance of a TRO, which will prevent consumer confusion. See *Eli Lilly & Co. v. Natural Answers, Inc.,* 233 F.3d 456, 469

(7th Cir. 2000) ("the public interest is served by the injunction because enforcement of the trademark laws prevents consumer confusion"). Defendants contend that in this case "the public's interest in preventing trademark infringement in general * * * is balanced by its interest in preventing a party to a licensing agreement from unilaterally and wrongfully abrogating it to allegedly gain commercial advantage." *The Little Tikes Co. v. Kid Station Toys, Ltd*., 2008 WL 1805379, at *6 (N.D. Ill. April 18, 2008). At the end of the day, these arguments underscore the proposition that the public interest is served when the Court issues a correct decision under the applicable contract and trademark law. From that perspective, it is too soon to tell where the public interest will lie in this case, and thus that factor must be deemed a wash at this stage of the case.

* * *

In sum, the factors that favor Scala's – a better than negligible likelihood of success on the merits, the absence of an adequate remedy at law, and the possibility of irreparable harm from the unlawful use of its marks – weigh only slightly in favor of the granting of the extraordinary relief of a TRO, while the balance of the irreparable harms points more decisively, though still not overwhelmingly, in favor of Defendants. The public interest factor is in equipoise. Although it is a close call, applying the sliding scale "as would a chancellor in equity," the Court concludes that Scala's has not made a sufficiently strong or clear showing of entitlement to immediate equitable relief in the circumstances of this case. However, in view of the consequences to both parties not only of an erroneous decision on the merits, but also of protracted uncertainty as to the status of the license and the marks, the Court will set an expedited schedule for disclosures, discovery, briefing, and hearing on Scala's request for a preliminary injunction.

13

**III. Conclusion**

For the reasons set forth above, Scala's motion for a TRO [6] is respectfully denied. The Court sets the following schedule for discovery on Scala's request for a preliminary injunction:

> The parties shall exchange disclosures pursuant to Rule 26(a)(1) within two weeks, by January 5, 2010, and simultaneously produce all documents identified in those disclosures.
>
> The parties shall serve each other with requests for documents – not to exceed five categories – within the same two-week time frame, by January 5, 2010.
>
> The parties shall respond to such document requests within ten days of service, including producing all documents responsive to the requests at that time.
>
> The parties shall make themselves available for deposition no later than January 15, 2010.
>
> The parties are allowed until January 22, 2010, in which to take depositions of any non-parties relevant to the preliminary injunction hearing.

In addition, this matter is set for status on January 5, 2010 at 9:30 a.m., at which time the Court will discuss with the parties additional issues pertaining to the preliminary injunction motion, including briefing and setting the matter for hearing during the week of January 25-29.

Dated: December 22, 2009         _____
                                 Robert M. Dow, Jr.
                                 United States District Judge